Good morning, Your Honors. I only have a few points to make, so I'll try not to burden too much of your time. But the primary issue here is that— Why don't you state your appearance, if you could? Oh, I apologize. John Litwin of Barkadarian Law Firm for Appellant Andrea Bordeaux. Thank you. And so the primary issue here is that the district court's refusal to consider the religious accommodation in the context of both WPI's finances and its place within their parent entity was in error. That was against both the plain language of Groff and also leads to some strange conclusions. The district court's reasoning was that a well-resourced defendant would essentially never be able to meet the undue burden standard, which is incorrect. It just means that the bar is higher for those entities who are better able to facilitate the public policy of meeting these accommodations. Also, in relation to the increased day-to-day costs and risk of a shutdown, it's important to note that appellant was only asking the appellees to abide by the same COVID protocols that they'd agreed to in Season 1, albeit in a much more limited, much more cost-effective manner. So those protocols had already been deemed not to be an undue hardship. And so it stands to reason that during Season 2— If I could ask you a question about the Season 2 protocols. Is there a way to relax those protocols at all, or is that basically set in stone because of union agreements? Season 2 said five days of quarantine if you've been exposed to someone who tests positive. Is that something in your belief is set in stone, there's no way around it, or is it something that you think Lionsgate could have accommodated it and relaxed it? I believe at the time they were union rules, but those protocols were constantly being relaxed as COVID became less and less severe. But by the union, not by Lionsgate, right? Correct. And so also just regarding the risk to Bordeaux's coworkers— Can I just clarify on Judge Lee's point? You're not saying that at any point the protection company required more than what the union required? Correct. And you didn't make any requests to Lionsgate to relax those Season 2 protocols? No. The request was only that they abide by the same protocols that they put in place in Season 1, albeit only for appellant, which would have been more limited in scope and more cost-effective than they were during Season 1. But how could they have not required the union rules be complied with? And I'm sorry, I may have been confused, but we were not requiring an exemption from the union rules. The union rules did not require vaccination. They permitted unvaccinated individuals to keep working. They just had to abide by this— You know, five days if you're quarantined, if you're exposed and unvaccinated or undervaccinated, and five days to mask. If that's a union requirement, I don't see how your client could have gotten an exception. She's not requesting an exception to the quarantine requirement, but in the event of a requirement which may or may not have come to pass and may have been speculative, which the odds of that is an issue that we believe should have been left to the jury, there may have been other steps that Lionsgate could have taken to mitigate these risks, such as changing filming schedules, as they did when another cast member tested positive, both a main cast member and a temporary cast member. The court also raised the concern of the risks to Ms. Bordeaux's co-workers, and Appleby's cite a significant amount of cases in support of that. However, I think it's important to note all of the cases cited by— The majority of the cases cited by Appleby's arose in the context of health care, and so health care providers working with individuals who were not or could not have been vaccinated, as well as the Bicart case, which involved a teacher around students who, at that time, could not have been vaccinated. That's meaningfully different than the present case, where all of Ms. Bordeaux's co-workers had been vaccinated, so the risks are meaningfully less. And so whether or not that was a significant risk is an issue that should have been left for the jury. So on that note, we will submit the matter to the court. Well, to make sure, there may be some questions here to speak to. Yeah, I have a question. Sure. If we think the potential shutdown is not unduly speculative, then would you agree that the $1.5 to $3 million in increased costs would be a substantial cost under Groff? We would argue that it's not, or at the very least, it's a matter best submitted to the jury, because that would still bring the costs in line with what they were paying in Season 1, which they deemed were not an undue hardship and was a cost that they could bear. What does that cost? You're saying the $1.5 million? In Season 1, they expended approximately $6.5 million in COVID protocols. So, yes, the increased cost of $1.5 to $3 million, if it came to pass, which may have been able to be mitigated by changing filming schedules, if that came to pass, that's still not an undue hardship. If we take your position is that we should consider the revenue of the entire Lionsgate company, right? Correct. If we take that to logical conclusions, I mean, can a large company like Apple or Tesla or Amazon, trillion-dollar market cap value, I mean, they would have to accommodate everyone, right? Because any cost would be very, very small compared to the revenues of such a large company. Not necessarily, and it's in the context of the filming of this season. The burden for those companies we do submit would be higher than a smaller company because, as stated in Groff, we need to take into account the entire context of the company, the entire context of the situation. And so those companies have a greater ability to grant religious accommodations with less of a burden on the company, which facilitates the public policy of allowing people to continue to work while adhering to their religious questions. But in Groff, that employee worked for the U.S. Postal Service, right? Correct. And for the undue hardship, they just looked at the hub where that employee worked. They didn't look at the entire United States Postal Service, right? So I guess I'm unclear. Even under Groff, it doesn't say look at all of Apple, right? It says look at the hub where the employee works. Groff didn't look at the entire United States Postal Service. No, or the entire United States government.  They said let's look at the location where this employee works. That's correct, although I will note that a little bit of a distinction, there was no way for the government to accommodate that without infringing on seniority rights, which were an issue in Groff, whereas here we're talking only about a financial matter, which is a little bit different. But we're trying to figure out when Groff talks about consider the context. That's really what we're looking at. In Groff, it said the context is the hub where the employee works, not the entire entity. But let me ask you another question. On the money, on the $1.5 to $3 million, it seems like your argument was mostly that the potential shutdown was just completely speculative. I didn't see in your brief that you were actually disputing the money, that that was not a substantial cost. Would you agree with that? We were not disputing the amount. We were disputing whether or not that that was an undue hardship, given the amount that the company had deemed was an acceptable cost during Season 1. Thank you, Counsel. Why don't we reserve your time for rebuttal in case you want to respond. Good morning, Your Honors. May I please support NARICAM on behalf of Pelley's World Productions, Inc. and Lionsgate Entertainment, Inc. There are three distinct grounds on which an undue hardship was found, the first being an added cost of $300,000 in production expenses to accommodate Ms. Bordeaux's exemption request. The second was what we're referencing as the $1.5 to $3 million range in a production shutdown. Should Ms. Bordeaux be required to mask and quarantine for a 10-day period, which was, as Mr. Litwin conceded, required by the union standards. And then the third— On the second one, sorry to interrupt. Can you address that point? Could Lionsgate have asked the union to relax its rules, the five-day quarantine rule, if they wanted to? I don't believe so. I believe that it was the SAG-AFTRA Return to Work Agreement that incorporated the CDC guidelines at the time, which required a person who either tested positive themselves or a person who came into close contact, meaning six feet of another person who tested positive. That person, under these circumstances, an actress on the show, would have been required to first quarantine for five days and then mask for five days, which would have effectively eliminated her ability to work on the show for 10 seconds. Was there any provision in the agreement that said you can ask for an exception or a variance? I don't believe so. So the context of the request here was by a main actress, a leading actress, on a television show that filmed eight episodes within a 10-week production timeline. And this was a person who could not mask because she appeared on screen, and this was a person who could not socially distance because she was required to interact with her screen partners and other cast and crew. So this is a pretty exceptional case and, quite frankly, one in which there isn't really a close call and undue hardship. We're talking about pretty staggering numbers in the $1.5 to $3 million range, which is well in excess of the magnitude of costs that Transworld Airlines and Groff are dealing with. Can I ask you, what metric are we supposed to use deciding whether the financial impact of a requested accommodation is an increased cost? Like, do we look at profit? Do we look at total revenue? Do we look at cash on hand? Do we look at operating expenses? Like, what are we supposed to consider? So to be clear, there's both economic burdens and non-economic burdens that are part of the analysis. So the economic burdens, I believe, include, at least per Groff, the operating cost of the employer and the employer size. Those are two of the factors that are enumerated in the Groff standard. But Groff is also very clear in that it needs to be an overall analysis of the practical impact of the accommodation that's made by this particular person. And here, that would include not only the operating cost of World Productions, Inc., which, by the way, is the employer being sued, and I think there was some confusion over which Lionsgate entity should have been sued in the first instance, and I think Ms. Bordoa can see that she never managed to sue the right one. And so we're dealing with World Productions, Inc. as the sole employer at issue. There's non-economic burdens as well, which were recognized by Groff and validated by Groff, including the health risks that can be posed to coworkers, as well as just morale, things of that nature. I think Mr. Litwin mentioned seniority rights. So, for instance, if there were union rules that required seniority rights to be honored, that's not necessarily an economic cost, but it's still part of the analysis. So there's many relevant factors, and two of which are the employer size and the operating cost. Should we look beyond just the WPI, the entity that was formed to create this show? Maybe we don't go as far as the entire Lionsgate, as your friend on the other side explains, but maybe we should look just beyond WPI because, I mean, it's no offense to your client or your industry, but there's well-known Hollywood accounting. It's like the reverse of Enron accounting. They create a special purpose vehicle not to hide losses but to hide profits. So, I mean, should we look maybe beyond at least WPI and a little bit broader? Again, I don't think you go to the extreme end of the entire company, the conglomerate. I think the panel really hit the nail on the head when it noted that, at least in Groff, the analysis was confined to the small rural station at which Mr. Groff requested a transfer, and that was, I believe, the one in Holtwood. And they mentioned it by name, and I think that's important. They also focused only on the regional hubs that would otherwise be affected in that area. The context is where the employee works, and I think that's not only clear in Groff, but it's also clear in the predecessor case, Transworld Airlines, where, again, this was a national domestic airline, one of the largest operating at the time, and the analysis focused exclusively on this one airport base in this one city and the two or three departments that would be affected by this employee. And, again, returning to the point that it's not just economic burdens but non-economic burdens as well, that's really the only common-sense way to look at it because— Could you imagine a situation where you would look broader if Groff says look at the overall context? Can you imagine a situation where, even though it looks like there are two entities, they really—I don't know what analogy we like, piercing the veil or something, that there really are effectively one entity and should be considered together? Can you imagine any situation where that would be the case? I'm sure it is possible, but the case at hand is a television production of a single show in which Miss Bordeaux starred as one of the leading actresses. So I think, hypothetically, maybe there is a situation in which a plaintiff does properly sue joint employers and there might be some other alternative theory of liability for a parent company or an affiliate, but that's not the situation we're in here. Should we look at, in assessing the substantial cost or burden, should we look at the position of the person who's asking for the accommodation? So, for example, you mentioned $300,000 would be the cost to accommodate Miss Bordeaux. Now, obviously, $300,000 would probably be a substantial burden to accommodate an extra on the set, who gets paid pittance, or the best boy, Griff, they don't get paid that much. But for a star of a show or a star of a movie, it's well-known, again, in this industry, you have a lot of millionaire malcontents who make a lot of unreasonable and costly demands, and the studios almost always meet those demands. Apparently, they don't consider it really substantial, apart from this context. So here, Miss Bordeaux was one of the key stars of the show, so maybe if you do a very fact-specific analysis, should we take that into account? I believe we actually addressed her salary and the amount of compensation she was paid on the show, and the $300,000 would have been quite substantial in relation to Miss Bordeaux, with respect, who was not quite an A-list celebrity, and I think the $300,000 compared quite large in comparison to what she would have been paid over the course of not just the first two seasons, but the rest of the contract. So it would have been substantial in this context. But you think we should consider the position as part of the fact-specific analysis required under DeJoy? I think all of the relevant factors, including the identity of the person requesting the accommodation, are supposed to be considered, and in this case, when we do consider it, whether it's the $300,000 metric or the $1.5 million to $3 million range, those are vastly, vastly substantial in comparison to what Miss Bordeaux would have been paid under her contract. You've got seven minutes. It's up to you how you want to use it. Well, if there are no other specific questions from the panel, I'd be happy to submit on the papers no arguments. Very well. Thank you. No, go ahead. You've got six minutes. Thank you, Your Honor. So just very brief rebuttal. To Your Honor's points about Hollywood Accounting and the regional hub, I do think it's a little misleading to or it's extremely misleading to look at WPI only as a separate company or one production when, in reality, it is, in a lot of ways, a vessel for the larger Lionsgate entity to park their assets to produce this company, given that both Season 1 and Season 2 were produced ahead of time, knowing that they were projected to run at a loss. Your client said that she would amend the complaint to add another Lionsgate entity, and she didn't. Why is that, if you think it really needs to be considered? I concede that the attorneys handling the matter at that time likely should have done that, but I don't think it's relevant in that we can still consider or I don't think it's dispositive, as we can still consider WPI's place in the larger company. Just on the issue of the company running a loss and those magnifying the burden of granting the accommodation, that was one of the reasonings the district court relied on, that a company should not be required to magnify its losses. That leads to the conclusion that any company operating at a loss would be absolved from the requirement to accommodate a religious accommodation, which is clearly a faulty reasoning. So I also think that that point undermines their argument. But on that, if there are no further questions, I will submit the matter on the papers in the argument. Just quickly, looking at your opening brief, it looks like the only challenge you make to the potential shutdown is that it's completely speculative. Can you give me a site as to where you say the $1.53 million is? I'm looking at page 13. Is this the opening brief or the reply brief? This is the opening brief. That may not be explicitly laid out in our opening brief, but these numbers are cited by Appalese in their brief, and we do argue that these are the same accommodations that were granted voluntarily at the studio's own initiative in Season 1. So providing them at a reduced cost is therefore not an undue burden. All right, thank you very much, counsel. Thanks to both of you for your briefing and argument in this very interesting case. Hollywood is always interesting. This matter is submitted.
judges: OWENS, LEE, KOH